**Robert LACHAT and Mary Lachat, Appellees,**

**v.**

**Frank A. HINCHLIFFE, Appellant.**

Superior Court of Pennsylvania.

Submitted Oct. 23, 2000.

Filed Feb. 20, 2001.

---

Guy C. Patterson, Lock Haven, for appellant,

Marc S. Drier, Jersey Shore, for appellees.

Before DEL SOLE, HUDOCK and TAMILIA, JJ.

HUDOCK, J.:

¶ 1 This is an appeal from an order which found, *inter alia*, Appellant, Frank A. Hinchliffe (Hinchliffe), to be in contempt and directed him to pay counsel fees on behalf of Appellees, Robert and Mary Lachat (the Lachats), and one-half the costs of a land survey. We reverse.

¶ 2 The dispute underlying the present appeal is of a long-standing nature. The certified record shows that in October of 1986, the Lachats commenced an action sounding in equity by filing a civil complaint requesting the trial court to direct Hinchliffe to cease all activities that interfered with their use of a thirty-foot wide tract of land subject to a right-of-way. The record further discloses that the right-. of-way in dispute was created in 1957 by the predecessors in title to both the Lachats and Hinchliffe. On September 7, 1957, the Lachats' predecessors in interest executed and caused to be recorded a "Right of Way Indenture" in favor of Hinchliffe's predecessors in interest. The instrument in question contains the following pertinent language:

[The parties of the first part] by these presents do grant, bargain, and sell, unto the said second party, and to his heirs and assigns, the free uninterrupted use, liberty, and privilege of, and passage in and along, a certain street of thirty (30) feet in breadth, more or less, by five hundred and fifteen (515) feet in depth, extending out of and from the Mill Road which leads from Youngdale to McElhattan in Wayne Township Clinton County, Pennsylvania, which said street is proposed on a plan showing lots as laid out for C.C. Ricker by John R. Mundy, said plan being dated September 22, 1952, and which said street lies along the southeast side of the messuage, the lot of the said parties of the first part.

TOGETHER with free ingress, egress and regress to and for the said second party, his heirs and assigns, his and their tenants, occupiers, or possessors of the said second parties' messuage and ground contiguous to the said street, at all times and seasons forever hereafter, into, along, upon, and out of the said street, in common with them, the said parties of the first part, their heirs and assigns, tenants or occupiers of the said first parties['] messuage and ground, adjacent to the said street.

Right of Way Indenture, executed 9/7/57.

¶ 3 The record does not explain the manner in which the right-of-way in question was exercised until the late 1980's. On October 21, 1986, the Lachats filed a complaint [1] alleging that Hinchliffe was impeding their own free use of the right-of-way by placing fill or stone on the property, thereby elevating it above the Lachats' property. The Lachats further alleged that Hinchliffe had improperly excavated the right-of-way, removing dirt and stones, and that he had constructed a fence over

---

1. The original complaint was amended on July 9, 1987.

the right-of-way, thereby blocking access to it. Hinchliffe filed an answer and new matter, to which the Lachats filed a reply. The matter was scheduled for a non-jury trial in May of 1988. However, on the date of trial, the parties entered into a stipulation concerning the disputed right-of-way. The Honorable Francis A. Searer, Specially Presiding, entered the following order:

### ORDER OF THE COURT

AND NOW, this 13th day of May, 1988, pursuant to stipulation of the parties each of the parties hereto shall deposit Four Hundred Dollars ($400.00) to the Prothonotary of Clinton County for repairs to right-of-way in controversy. Work shall be done on the right-of-way in a workmanlike manner and the roadway restored to the same contour which previously existed; said contour shall be maintained hereafter. Neither party hereto or their heirs and assigns shall interfere in any manner with the other's right to the use of said roadway.

Order filed 5/13/88. We emphasize that this order explicitly recognizes that Judge Searer proceeded pursuant to a stipulation. The certified record is devoid of any factual findings by the trial court. Nor are there conclusions of law addressing the points raised in the parties' pleadings as of the date of the 1988 order.

¶ 4 The record shows that Hinchliffe deposited the required funds with the trial court the very day on which Judge Searer entered his order. The Lachats complied on May 24, 1988. The trial court docket shows that the excavating work contemplated by the order was completed as of July 28, 1988, and payment was disbursed

by the Clerk of Courts on that date. No further docket entries occurred for twelve years, until March of 2000.

¶ 5 In July of 1988, the Lachats subdivided their property and conveyed a portion to their daughter, Eileen Young, and her husband, Wilbur, by deed executed July 8th of that year. The deed in question granted the Youngs access to the right-of-way via the following clause:

ALSO GRANTING AND CONVEYING unto the Grantees [the Youngs] herein, their heirs and assigns, the right of ingress, egress and regress over and upon a certain thirty (30') foot right-of-way running from the western line of Township Road No. 427 along the southwestern line of Lots No. 1 and 2 as shown on the above-referenced subdivision.

See Deed executed 7/8/88.

¶ 6 The record developed in the trial court discloses that the relationship between Hinchliffe and the Lachats and Youngs was neither friendly nor "neighborly." Disputes occurred over grass mowing, allegedly improper snow handling, and comments attributed to Hinchliffe that he "owned" one side of the right-of-way while the Lachats and Youngs "owned" the other side. In January of 2000, Hinchliffe began parking flat-bed trailers along the stabilized driveway, allegedly for the purpose of preventing the Youngs and Lachats from driving on grassy areas he maintained within the right-of-way.[2] Hinchliffe also sent a hand-printed note complaining about a large pine tree in the roadway, which he wanted to have either cut down or trimmed because it interfered with his access to the stabilized roadway. In the note, Hinchliffe threatened to block access along the stabilized drive.[3]

---

2. Testimony of record discloses that the Lachats and the Youngs also parked vehicles within the right-of-way at the side of the stabilized roadway. N.T., 4/18/2000, at 29.

3. The hand-printed note has been incorporated as part of the certified record. Hinchliffe's note states the following:

¶ 7 On March 22, 2000, the Youngs filed a Petition for Contempt to enforce Judge Searer's 1988 order. The trial court issued a Rule Returnable the following day requiring Hinchliffe to show why the requested relief should not be granted. On April 18, 2000, the Honorable J. Michael Williamson conducted a contempt hearing at which a new survey was entered into evidence. Daniel A. Vassallo (the surveyor), Wilbur Young, Robert G. Lachat, and Frank A. Hinchliffe all testified at the proceeding. Following the contempt hearing, the trial judge entered a finding of contempt against Hinchliffe, which states in pertinent part:

1. The disputed right-of-way between the parties is deemed to be located on the ground in accordance with the survey of Daniel A. Vassalo, a Pennsylvania licensed surveyor, dated February 11, 2000, attached hereto, incorporated herein by reference, and previously marked in this matter as Plaintiffs' Exhibit 2.

2. Based upon the stipulation entered into between the parties resulting in the Order of May 13, 1988, the expense of maintaining the entire thirty (30) foot wide right-of-way from Linwood Drive to the Consolidated Rail Corporation land shall be borne equally by the parties, unless Defendant shall execute an amendment to the right-of-way agreement which limits his use of the right-of-way to that portion between Linwood Drive and the gate to his property, in which case his obligation to share equally in the cost of maintenance shall only extend to his driveway.

3. Neither party shall do anything to interfere with the right of the other, the heirs, assigns, licensees, or invitees of the other, with respect to the entire thirty (30) foot width of the right-of-way as located by Vassallo; neither party shall place any object or substance, artificial or natural, including snow, upon the right-of-way.

4. With respect to the twelve (12) inch pine tree identified on Vassallo's survey, either party may remove said pine tree; the cost of said removal shall be borne in accordance with the provisions of Paragraph 2.

5. A copy of this Order shall be sent to PPL Resources for their guidance in determining why they chose to locate a pole in the middle of the right-of-way.

6. Based upon the Court's finding that [Hinchliffe] is in contempt of Judge Searer's order of May 13, 1988, [Hinchliffe] shall pay to [Lachats], on or before the 31st day following this Order, the sum of Four Hundred Fifty Dollars ($450.00) in counsel fees and fifty percent (50%) of the cost of the Vassallo survey.

/s/ Frank Hinchliffe

1–24–00 *FINAL NOTICE*
To the Lachats & The Youngs & all The Friends
So now you are driving across my yard. Ha, Ha, Very Funny. By the end of this month, you will cut down this tree and trim any tree extending over the right of way at your expense.
If I cut them, you may lose your power. After the 31st, the road will be closed one way or the other. You people seem to think the right of way is yours to do as you wish, but not so. You will build a road of your own & not use the one I built.

Exhibit "B" (Petition for Finding of Contempt and Award of Sanctions) filed 3/22/00. We note that testimony of record indicates that the pine tree in question is very large, and possesses a trunk that is twelve inches in diameter. For this reason, the trial court consistently refers to it as the "twelve inch" tree. The tree's branches extend over a power line that services the Youngs' property. N.T., 4/18/00, at 9–10, 21–22.

Trial Court Order, dated 4/18/00, at 3–4. Hinchliffe subsequently filed both a motion for reconsideration with the trial court and a supersedeas. On May 18, 2000, he also lodged a timely notice of appeal to this Court.

¶ 8 The trial court denied the supersedeas and the motion for reconsideration on May 19, 2000, without conducting a second hearing. The trial court directed Hinchliffe to file a Statement of Matters Complained of on Appeal pursuant to Rule of Appellate Procedure 1925(b). Hinchliffe complied on June 2, 2000. The trial court filed an opinion on June 8, 2000. Hinchliffe now presents two issues for our consideration:

1. Whether the lower court erred in finding [Hinchliffe] in civil contempt of a prior court order when [Hinchliffe's] actions did not violate the specific terms of the prior order, and the prior order was ambiguous and omitted certain information?

2. Whether the lower court erred in using a contempt proceeding from a 1988 Court Order limiting the use of a certain roadway as a means to adopt a 2000 survey as the location of the right-of-way, order the sharing of expenses of maintenance, clarify and expand the terms of the prior order, specifically permit the removal of an existing tree and to direct the local power company to provide "guidance" on why a pole is in the middle of the right-of-way?

Hinchliffe's Brief at 1. As an initial point, we note that appellate review of a finding of contempt is limited to deciding whether the trial court abused its discretion. *McMahon v. McMahon*, 706 A.2d 350, 356 (Pa.Super.1998). *See also Sinaiko v. Sinaiko*, 445 Pa.Super. 56, 664 A.2d 1005, 1009 (1995) (Superior Court review of finding of civil contempt is limited to determining whether the trial court committed a "clear" abuse of discretion).

Judicial discretion requires action in conformity with law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason. Similarly, the trial court abuses its discretion if it does not follow legal procedure.

*Miller v. Sacred Heart Hospital*, 753 A.2d 829, 832 (Pa.Super.2000) (quotations and citations omitted). This Court must place great reliance on the sound discretion of the trial judge when reviewing an order of contempt. *Sinaiko*, 664 A.2d at 1009.

¶ 9 Before addressing the merits of Appellant's substantive claims, we first must settle two procedural questions: (1) whether the finding of contempt in this case constitutes civil, criminal, or indirect criminal contempt; and (2) whether the trial court's order is final and thus appealable. Resolution of the latter point goes to the jurisdiction of this Court to entertain the appeal. *See Sargent v. Sargent*, 733 A.2d 640 (Pa.Super.1999) (premature appeal from finding of contempt is interlocutory and appeal must be quashed). Because the resolution of the specific type of contempt at issue in this case is necessary before we can ascertain whether the order is final, we shall address that point first.

¶ 10 The determination of whether a particular order contemplates civil or criminal contempt is crucial, as each classification confers different and distinct procedural rights on the defendant. *Kramer v. Kelly*, 265 Pa.Super. 58, 401 A.2d 799, 801 (1979). There is nothing inherent to a contemptuous act or refusal to act which classifies the act itself as "criminal" or "civil." *Diamond v. Diamond*, 715 A.2d 1190, 1194 (Pa.Su-

per.1998). The distinction between criminal and civil contempt is rather a distinction between two permissible judicial responses to contumacious behavior. *Id.* These judicial responses are classified according to the dominant purpose of the court. *Id.* If the dominant purpose is to vindicate the dignity and authority of the court and to protect the interest of the general public, it is a proceeding for criminal contempt. *Knaus v. Knaus*, 387 Pa. 370, 376, 127 A.2d 669, 672 (1956). But where the act of contempt complained of is the refusal to do or refrain from doing some act ordered or prohibited primarily for the benefit of a private party, proceedings to enforce compliance with the decree of the court are civil in nature. *Id.* at 377, 127 A.2d at 672. The purpose of a civil contempt proceeding is remedial. *Id.* Judicial sanctions are employed to coerce the defendant into compliance with the court's order, and in some instances, to compensate the complainant for losses sustained. *Id.*

The factors generally said to point to a civil contempt are these: (1) Where the complainant is a private person as opposed to the government or a governmental agency; (2) where the proceeding is entitled in the original ... action and filed as a continuation thereof as opposed to a separate and independent action; (3) where holding the defendant in contempt affords relief to a private party; (4) where the relief requested is primarily for the benefit of the complainant; and (5) where the acts of contempt complained of are primarily civil in character and do not of themselves constitute crimes or conduct by the defendant so contumelious that the court is impelled to act on its own motion.

*Knaus*, 387 Pa. at 378, 127 A.2d at 673. These factors are all present in the instant case. Moreover, it is clear from the record that the trial court's dominant purpose was to coerce Hinchliffe into compliance with the 1988 order entered in this case. Thus, we conclude that the order entered in April of 2000 comprises an adjudication of civil contempt.

¶ 11 Until sanctions are actually imposed by the trial court, an order declaring a party to be in contempt is interlocutory and not appealable. *Sargent*, 733 A.2d at 641. In the present case, the trial court's order includes both a finding of contempt against Hinchliffe and a directive to make remedial payment to the Youngs for surveyor's fees and attorney fees. We conclude that the terms of the trial court's order thus explicitly impose "sanctions" and therefore the order is final and appealable for the purposes of Rule of Appellate Procedure 341 (Final Orders).

¶ 12 Hinchliffe's first contention on appeal is that the trial court erred in entering a finding of contempt on the grounds that the testimony disclosed no violation of the terms of the 1988 stipulated order. In essence, Hinchliffe challenges the sufficiency of the evidence adduced at the hearing to sustain the contempt finding. In proceedings for civil contempt of court, the general rule is that the burden of proof rests with the complaining party to demonstrate, by preponderance of the evidence, that the defendant is in noncompliance with a court order. *Barrett v. Barrett*, 470 Pa. 253, 263, 368 A.2d 616, 621 (1977); *Sinaiko*, 664 A.2d at 1009. However, a mere showing of noncompliance with a court order, or even misconduct, is never sufficient alone to prove civil contempt. *Marian Shop, Inc. v. Baird*, 448 Pa.Super. 52, 670 A.2d 671, 673 (1996).

¶ 13 To be punished for contempt, a party must not only have violated a court order, but that order must have been *"definite, clear, and specific*-leaving

no doubt or uncertainty in the mind of the contemnor of the prohibited conduct." *Id.*

> Because the order forming the basis for civil contempt must be strictly construed, any ambiguities or omissions in the order must be construed in favor of the defendant. In such cases, a contradictory order or an order whose **specific terms** have not been violated will not serve as the basis for a finding of contempt.

*Id.* (emphasis added). To sustain a finding of civil contempt, the complainant must prove certain distinct elements: (1) that the contemnor had notice of the specific order or decree which he is alleged to have disobeyed; (2) that the act constituting the contemnor's violation was volitional; and (3) that the contemnor acted with wrongful intent. *Id.* A person may not be held in contempt of court for failing to obey an order that is too vague or that cannot be enforced. *Id.*, 670 A.2d at 674.

▮▮▮▮ ¶ 14 When holding a person in civil contempt, the court must undertake (1) a rule to show cause; (2) an answer and hearing; (3) a rule absolute; (4) a hearing on the contempt citation; and (5) an adjudication of contempt. *McMahon*, 706 A.2d at 356. The procedure followed need not utilize the above nomenclature. *Id.* The procedure suffices if the contempt order was issued after a full hearing at which evidence was presented, and so long as the trial court gave the contemnor an opportunity to purge himself of the contempt by fulfilling a condition. *Id.* The trial court must also set a date for a second hearing before finally adjudicating the contempt. *See id.* (applying the ruling in *Crislip v. Harshman*, 243 Pa.Super. 349, 365 A.2d 1260, 1261 (1976)).

▮▮▮ ¶ 15 In the present case, Hinchliffe contends that the trial court erred in several ways by finding him in contempt of the 1988 order. First, Hinchliffe maintains that it was improper for the trial court to interpret the terms "roadway" and "right-of-way" interchangeably as employed in the 1988 order. He also contends that his is not the only conduct that could be deemed deleterious to the interests of the adverse parties and violative of the order in question. Finally, he complains that although his own conduct can be considered volitional, it cannot be deemed to constitute willful disobedience to the court order of 1988.

¶ 16 In the present case, the 1957 Indenture between the predecessors in interest to the parties grants a right-of-way for the use of a proposed "street" which never was constructed in a plan which apparently never was developed.[4] By its explicit terms, the Indenture defines the right-of-way in question as being 30 feet by 515 feet. The trial court's order of May 13, 1988, refers both to the "right-of-way" and separately to a "roadway." The testimony adduced at the contempt hearing in April of 2000, as well as the survey prepared on February 11, 2000, establishes that there is a "stabilized driveway" or "stabilized roadway" that runs for most (but not the entirety) of the length of the right-of-way, and which is approximately half the width of the right-of-way itself. The 1988 survey does not depict the "stabilized roadway." However, the pleadings filed at that time patently concern themselves with the excavating and paving operations implicated in the construction of the "stabilized roadway." In light of these facts, we must therefore agree with Hinchliffe's position that the terms employed in the 1988 order refer to two separate things. The term

4. *See* Right of Way Indenture, *supra.* The certified record contains no copy of the plot plan to which the Indenture refers, nor was testimony on this point adduced at the contempt hearing conducted in April of 2000.

"right-of-way" refers to the rights of all the parties to use the thirty foot by five hundred fifteen foot portion of the land subject to the 1957 Indenture, as transmitted to the parties via the relevant deeds recorded in Clinton County. The term "roadway" refers to the stabilized drive or stabilized roadway constructed at a later date upon the property subject to the right-of-way.

¶ 17 The explicit terms of the 1988 order stated the following with regard to the parties' exercise of their rights:

> Neither party hereto or their heirs and assigns shall interfere in any manner with the other's right to the use of said roadway.

Order filed 5/13/88. The testimony adduced at the 2000 hearing established that Hinchliffe parked flatbed trailers within the confines of the right-of-way and at the side of the stabilized roadway. The evidence also disclosed that Hinchliffe at times piled snow within the right-of-way outside the gate to his home, and that some of the snow went onto the stabilized roadway. Finally, evidence of record demonstrates that Hinchliffe threatened to block access to the stabilized roadway. However, no testimony or other evidence established that Hinchliffe actually blocked the stabilized roadway in a manner that prevented either the Lachats or the Youngs from using it.

¶ 18 To the contrary, Wilbur Young explicitly admitted that he and his wife were always able to use the stabilized roadway to access their home, and that Hinchliffe never actually blocked their use of the roadway. See N.T., 4/18/2000, at 19. Although Robert Lachat stated that he "had trouble with" Hinchliffe, id. at 24, Lachat

never testified that Hinchliffe prevented him or his wife from using the stabilized roadway.[5]

¶ 19 We have scrutinized the entirety of the certified record. Our careful consideration of the record leads us to conclude that, although Hinchliffe parked flatbed trailers and dumped snow within the right-of-way, he did not park the trailers on the stabilized roadway in direct violation of the order of May 13, 1988, nor did he place the snow in a manner that prevented the Lachats or the Youngs from using the roadway. Hinchliffe demonstrably threatened to disobey the court order in question. However, we find not a scintilla of evidence showing that he actually did so. Future plans to disobey a court order will not sustain a present finding of contempt. See Marian Shop, Inc., 670 A.2d at 673 (to be punished for contempt, a party actually must have violated a definite, clear, and specific order). No evidence of record discloses that Hinchliffe willfully placed himself in noncompliance with the explicit terms of the 1988 order at any time by actually thwarting the rights of the Youngs or the Lachats to use the stabilized roadway.

¶ 20 We are cognizant of the fact that a plausible reading of the 1988 order could possibly support the trial court's interpretation and the result reached below. However, in order to punish a person for contempt, a "plausible reading" is not enough. Carborundum Company v. Combustion Engineering, Inc., 263 Pa.Super. 1, 396 A.2d 1346, 1349 (1979). All inferences and ambiguities in the underlying order must be construed in favor of the alleged contemnor. Id. Judge Searer's 1988 order refers to both a "right-of-way"

---

5. Lachat's testimony was largely concerned with grass cutting disputes and his dislike of the rudeness allegedly displayed by Hinchliffe. Lachat never stated that he was prevented from using the stabilized roadway or that Hinchliffe had actually blocked the roadway at any time. Furthermore, Lachat never averred that Hinchliffe had prevented him from using any part of the right-of-way. N.T., 4/18/2000, at 23–26 (testimony of Lachat).

and to a "roadway." The testimony of the parties and the survey completed in 2000 indicates that these are, at least arguably, not coterminous. Construing this possible ambiguity in favor of Hinchliffe, we conclude that it was a clear abuse of discretion for the trial court to find contempt in this case. We therefore must reverse the order entered April 18, 2000, adjudicating Hinchliffe in contempt of the trial court's 1988 order.

¶ 21 We turn now to Hinchliffe's second issue. The crux of this complaint hinges on his contentions that the trial court improperly expanded its scope of consideration to address questions not strictly implicated by the contempt petition that actually was before the court. Hinchliffe alleges that the trial court considered problems that exist between the various parties in interest to this matter that do not pertain to use of the "roadway" specified in the 1988 order. In this context, Hinchliffe disputes the propriety of the trial court's decision to admit evidence concerning the existence of certain permanent impediments placed upon the right-of-way, i.e., a utility pole installed by the electric company, and the twelve inch pine tree. We agree with Hinchliffe that these items are not mentioned in the 1988 order. Furthermore, there is no evidence of record that indicates that Hinchliffe either planted the tree or that he was responsible for the placement of the utility pole. Thus, evidence concerning these obstacles in the right-of-way is not germane to a determination of whether Hinchliffe was in contempt of the 1988 order.[6]

¶ 22 We also agree with Hinchliffe that the trial court employed the contempt hearing as a forum to attempt the resolution of all the myriad disputes between the parties. This was improper. The focus of a contempt hearing is very narrow and is confined to a consideration of whether the specific order before the court has been violated. See, e.g., Carborundum Co., 396 A.2d at 1348 (discussing the proper usage of the contempt process). Because Hinchliffe was entitled to assume that the only issue before the court was the proper use of the "roadway" under the terms of the 1988 order, he was not placed on notice that a new survey would be introduced for the purpose of adjudicating the general boundaries of the entire right-of-way. Thus, it is not surprising that Hinchliffe brought no expert witness to rebut the survey proffered by the Lachats, and that he never ordered the preparation of his own survey. Under these circumstances, we conclude that it was improper for the trial court to order Hinchliffe to pay half of the cost incurred by the Lachats in the preparation of the 2000 survey for their own purposes. Since the certified record does not disclose evidence that warrants a finding of contempt against Hinchliffe at this time on the basis of any alleged violations of the 1988 order, we must reverse the entirety of the trial court's order.[7]

¶ 23 Order reversed. Superior Court jurisdiction relinquished.

¶ 24 TAMILIA, J. files a Dissenting Opinion.

---

6. The issue of whether the branches of the twelve-inch pine tree hinder Hinchliffe's use of the stabilized roadway is a separate question from whether Hinchliffe was in contempt of the 1988 order. There is no evidence of record indicating that Hinchliffe planted the tree, or that the tree interfered with the Lachats' or the Youngs' use of the roadway.

7. We are cognizant of the Lachats' request that we award counsel fees pursuant to Rule of Appellate Procedure 2744 on the grounds that the appeal is frivolous. An appeal is "frivolous" for the purposes of Rule 2744 if the appellate court determines that the appeal lacks any basis in law or in fact. Thunberg v. Strause, 545 Pa. 607, 620, 682 A.2d 295, 302 (1996). Under the circumstances of this case,

TAMILIA, J., dissenting:

¶ 1 I respectfully dissent. I believe the stipulated Order of May 13, 1988 must be read in conjunction with the September 7, 1957 grant of "free uninterrupted use, liberty and privilege of, and passage in and along, a certain street of thirty (30) feet in breadth, more or less, by five hundred and fifteen (515) feet in depth." Reading the instruments in tandem, I believe the construction as to permissible use by the majority would limit the use by appellee to a narrow "roadway" of less than 30 feet in breadth, while permitting obstruction and limitation on use beyond the "roadway" by appellant. This is not a proper reading of the original grant and the stipulation. I agree with the trial court that so succinctly found appellant's argument "to be totally frivolous and inconsistent with Pennsylvania law. Any reading of the 1957 right-of-way clearly establishes ... Plaintiffs' predecessors in title[ ] conveyed to ... Defendant's predecessor in title[ ] a thirty (30) foot right-of-way over property entirely owned by Plaintiffs' predecessor in title, their heirs, and assigns. This Court believes it to be obvious that the entire thirty (30) foot width of the right-of-way must be kept free and clear of all impediments, whether or not the entire thirty (30) foot is actually paved or used for vehicular travel." (Trial Court Opinion, Williamson, J., 4/18/00, at 2–3.)

¶ 2 I would affirm the trial court's Order of April 18, 2000.

we are unable to deem Hinchliffe's appeal to be frivolous, and, thus, we decline to award counsel fees.