J-A01029-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| MICHAEL BROWN | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JANINA RUMER | : | No. 1937 EDA 2024 |

Appeal from the Order Entered June 20, 2024
In the Court of Common Pleas of Montgomery County Civil Division at
No(s):  2012-07624

BEFORE:  DUBOW, J., KING, J., and SULLIVAN, J.

MEMORANDUM BY KING, J.:                    **FILED FEBRUARY 25, 2025**

Appellant, Michael Brown ("Father"), appeals from the order entered in

the Montgomery County Court of Common Pleas, which granted the petition

for modification of custody filed by Appellee, Janina Rumer ("Mother") and the

separate order entered that same day granting Mother's petition for civil

contempt.  We affirm.

The trial court opinion set forth the relevant facts and procedural history

of this appeal as follows:

> On March 28, 2012, [Father] filed an emergency complaint
> for custody with the Montgomery County Court of Common
> Pleas, seeking custody of [G.B. ("Child") (d.o.b. 8/11)].
> This is an extremely high-conflict custody case that has
> involved over 400 pleadings; 13 Protection from Abuse
> Petitions ("PFA"); continuous police involvement; multiple
> referrals to the Montgomery County Office of Children and
> Youth ("OCY"); allegations against the other parent;
> evidence of disparaging remarks between the parents and
> in the presence of the child; and allegations of drug abuse,

alcohol abuse, and emotional and physical abuse of the child. As a result, the court has made referrals to OCY and appointed a guardian *ad litem* during the course of the litigation based upon the allegations made by the parents against each other.

A brief summary of recent litigation in this matter is as follows:

On June 29, 2022, [Mother] filed an emergency petition for modification of custody order seeking sole physical and legal custody due to the child's allegations that [Father] physically abused her.[1] The trial court deemed the matter non-emergent due to the active PFA prohibiting contact with the child, and the parents proceeded to custody conciliation.

[1] At the time, there was an active temporary [PFA] order against [Father], prohibiting him from contacting [Mother] or the child. [Mother] made the same allegations in [the] PFA petition as in the June 29, 2022 emergency petition for modification of custody.

On December 20, 2022, the conciliator issued her report recommending that the court order [Father's] custody be supervised by a mutually agreed upon third party, that is also a mandatory reporter, and that [Father] and the child begin reunification therapy. Following conciliation, the court scheduled a conference and subsequently a hearing for May 5, 2023. On March 6, 2023, the court issued an interim custody order granting [Father] supervised visitation with the child for two hours on Sundays.

After the protracted hearing and child interview on May 5, 2023, the court issued a custody order granting [Father] visitation with the child for four hours each week, supervised by his mother, Paternal Grandmother, and scheduling the matter for another conference on July 13, 2023. Following the short list conference, the court scheduled the matter for a protracted hearing on September 21, 2023. After this hearing, the court amended the July 13, 2023 order, lifting the supervisory requirement for [Father's] visitation with the child, and continuing the matter for the court ruling on October 11, 2023.

On October 12, 2023, the trial court issued the custody order granting the parents shared legal and physical custody of the child. For the first three weeks of the month, [Father] was granted weekend custody from Friday after school until Monday drop-off at school, as well as a weekly Wednesday dinner visit. For the fourth week of the month, [Father] was granted custody from Tuesday after school until Friday morning drop-off at school.

On December 4, 2023, [Mother] filed an emergency petition for modification of the October 12, 2023 custody order alleging that [Father] interfered with her ability to enroll the child in therapy. On the same day, [Mother] filed an emergency petition for civil contempt for disobedience of custody order alleging that [Father] withheld the child from her for several weeks. The court conducted a multi-day protracted hearing on the outstanding petitions, during which testimonial and documentary evidence were presented. The court also conducted several child interviews *in camera* of the minor child, pursuant to 23 Pa.C.S. § 5328(a)(7).

On June 20, 2024, the trial court issued the instant custody order making modifications of the October 12, 2023 physical custody order, granting Mother sole legal custody with regards to the child's therapy. The trial court also issued an order finding [Father] in contempt of a number of provisions of the October 23, 2023 order and imposing sanctions.

(Trial Court Opinion, filed 8/20/24, at 1-3) (record citations and unnecessary capitalization omitted). On July 19, 2024, Father timely filed a single notice of appeal purporting to appeal from both the custody and contempt orders.[1]

---

[1] "It has been held that a single appeal is incapable of bringing on for review more than one final order, judgment or decree[.]" ***General Elec. Credit Corp. v. Aetna Cas. & Sur. Co.***, 437 Pa. 463, 470, 263 A.2d 448, 452 (1970)). Nevertheless, where an appellant has filed a timely, albeit discouraged, appeal of multiple orders, circumstances may permit this Court
*(Footnote Continued Next Page)*

The notice of appeal included a concise statement of errors complained of on appeal.

Father now presents two issues for this Court's review:

Did the Court of Common Pleas abuse its discretion and fail to protect and promote the best interests of [Child] in granting to [Mother] sole legal custody regarding the child's therapy and medical treatment—empowering [Mother] to make these decisions unilaterally without any input from [Father]?

Did the Court of Common Pleas abuse its discretion and fail to apply governing law in finding [Father] in contempt of provisions of the court's October 12, 2023 order and imposing sanctions on [Father]?

(Father's Brief at 2).

In his first issue, Father complains that the court modified the October 12, 2023 custody order by: 1) giving Mother the ability to choose Child's pediatrician and enroll Child in individual therapy; and 2) making Mother the final decision maker when the parties cannot agree on a course of action for Child. Father insists that the facts adduced at the custody hearings did not support these modifications. Father emphasizes the court's findings that Child loves both parents, and both parents can fulfill their parental duties. Father also relies on his own testimony for the proposition that he has worked in

_____

to refrain from quashing the whole appeal. *See id.* (considering appeal from two judgments, but noting disapproval of procedure; among other things, statutory period allowed for appeal had already expired, precluding institution of proper appeals). Under the circumstances of the instant case, we decline to quash Father's appeal.

"good faith" with Mother while providing "consistent care for his daughter's needs in all regards." (*Id.* at 21).

Father acknowledges that Child's medical and mental health appointments have been an ongoing point of contention between the parties. Nevertheless, Father denies interfering with Child's medical care. Father also contends "that he had consistently taken his daughter to her [therapy] appointments—missing only one appointment" due to a family emergency. (*Id.* at 22). To the extent that Mother attempted to characterize Father as "difficult and unwilling at times to comply with all scheduled visits," Father argues that the parents' disagreements amount to "typical frictions in such situations." (*Id.* at 24). Based upon the foregoing, Father concludes that the trial court's decision to modify the custody order was manifestly unreasonable. We disagree.

In reviewing a child custody order:

> [O]ur scope is of the broadest type and our standard is abuse of discretion. This Court must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, this Court must defer to the trial judge who presided over the proceedings and thus viewed the witnesses first hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

***S.J.S. v. M.J.S.***, 76 A.3d 541, 547-48 (Pa.Super. 2013) (quoting ***A.D. v.***
***M.A.B.***, 989 A.2d 32, 35-36 (Pa.Super. 2010)).

> [I]t is not this Court's function to determine whether the
> trial court reached the 'right' decision; rather, we must
> consider whether, 'based on the evidence presented, given
> due deference to the trial court's weight and credibility
> determinations,' the trial court erred or abused its discretion
> in awarding custody to the prevailing party.

***E.B. v. D.B.***, 209 A.3d 451, 468 (Pa.Super. 2019) (quoting ***King v. King***, 889
A.2d 630, 632 (Pa.Super. 2005)).

The paramount concern in any case under the Child Custody Act is the
best interests of the child. ***See*** 23 Pa.C.S.A. § 5328 (stating: "In ordering
any form of custody, the court shall determine the best interest of the child
by considering all relevant factors…"); 23 Pa.C.S.A. § 5338 (stating: "Upon
petition, a court may modify a custody order to serve the best interest of the
child"). Section 5328(a) sets forth the best interest factors that the trial court
must consider in awarding custody:

> **§ 5328. Factors to consider when awarding custody**
>
> **(a) Factors.**—In ordering any form of custody, the court
> shall determine the best interest of the child by considering
> all relevant factors, giving weighted consideration to those
> factors which affect the safety of the child, including the
> following:
>
>> (1) Which party is more likely to encourage and
>> permit frequent and continuing contact between
>> the child and another party.
>>
>> (2) The present and past abuse committed by a
>> party or member of the party's household, whether
>> there is a continued risk of harm to the child or an

- 6 -

abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13)  The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.  A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14)  The history of drug or alcohol abuse of a party or member of a party's household.

(15)  The mental and physical condition of a party or member of a party's household.

(16)  Any other relevant factor.

23 Pa.C.S.A. § 5328(a).[2]

Further:

The parties cannot dictate the amount of weight the trial court places on the evidence.  Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa.Super. 2009) (quoting *S.M. v. J.M.*, 811 A.2d 621, 623 (Pa.Super. 2002)).

Instantly, Mother filed her emergency petition for modification of custody on December 4, 2023.  In it, Mother claimed that Child was not

---

[2] Our legislature amended the custody factors, effective August 13, 2024.  *See* Act of April 15, 2024, P.L. 24, No. 8, § 3.  Because the current proceedings took place prior to the effective date of the amendments, we consider the version of Section 5328 in effect at the time of the custody hearing.

attending school or therapy[3] on a regular basis, and Father had withheld Child from certain custody exchanges. Mother blamed these issues on Father's inability to communicate with her. Thus, Mother requested that the court award her sole legal custody of Child.

Thereafter, the court conducted hearings on the matter. Regarding therapy, Mother testified that Father delayed Child's enrollment in court-ordered therapy by failing to sign the relevant paperwork until November 2023. (*See* N.T. Hearing, 3/1/24, at 57). Mother stated that Father signed the paperwork only after she contacted Father's attorney and threatened to file a contempt petition. (*Id.*) Mother also provided an explanation for Father's reluctance:

> He was very adamant on still sending [Child] to [her prior mental health provider] which it was already decided that she was no longer going to … and she was to go to Child and Family Focus through the court. He was still adamant about sending her there. I explained that she's going to Child and Family Focus.
>
> He created a lot of problems there and said that they—he was going and demanding paperwork saying they don't provide court-ordered counseling. They obviously do. It's where she goes now and he was just making it extremely difficult and was really like not willing to let her go to Child and Family Focus.

---

[3] The relevant custody order provided: "Child shall undergo mental health treatment at … Child and Family Focus immediately upon a therapist becom[ing] available for her to begin meeting with." (Order, dated 10/12/23, at 2).

(N.T. Hearing, 6/12/24, at 19-20). After Child's enrollment, Father neglected to take her to appointments:

> Initially, Father wasn't taking her to any … appointments. Like he made scheduling impossible initially and then finally when we got a schedule he wasn't taking her on—like I had three days out of a month and he had one and he wasn't taking her to that, and then she was about to get discharged which was my concern.

(***Id.*** at 20).

Mother also expressed concerns about Father's lack of communication surrounding Child's medical appointments. Mother recounted an incident in October 2023, where Father picked up Child at school and took her to a dermatology appointment without informing Mother. (***See*** N.T. Hearing, 3/1/24, at 39). After this appointment, Child had an allergic reaction to the new dermatology medication. Without telling Mother, Father then took Child to her pediatrician to treat the reaction. (***See id.*** at 39, 41). For his part, Father conceded that he did not inform Mother about all of Child's doctors' visits during his custodial periods. (***See*** N.T. Hearing, 6/12/24, at 154).

At the conclusion of her testimony, Mother succinctly summarized her concerns with Father's co-parenting:

> He has violated the [custody] order in pretty much every fashion possible. He does not follow any orders. He never has and he's not going to.
>
> \*    \*    \*
>
> I think the decision making when you have somebody that's deliberately making everything difficult intentionally is impossible and it really makes it hard to just do the

> appropriate necessary things for our daughter like doctors' appointments, like therapy, vocal lessons, school.

(*Id.* at 46-47).

On June 14, 2024, the court conducted another hearing to provide an on-the-record analysis of the custody factors. The court noted that the parties would regularly contact each other related to Child's care and well-being, but the communications would needlessly escalate into a conflict. The court emphasized one series of communications, which occurred on December 19, 2023. At that time, Mother used Our Family Wizard to inform Father that Child was sick with a fever, was seen by the pediatrician, and she could not return to school. (*See* Mother's Exhibit 6, submitted 6/12/24). Father's response immediately escalated the situation:

> Is she really sick or are you making it up and pretending that she is sick should I call the school the Dr office and the police and cys to make sure. Pretty stupid huh isn't that ironic that she is sick again now what everyone is going to think your lying, see your actions are now playing against themselves now you set it up for everyone to chastise ████ and our families because your a bad person and you should be ashamed of yourself.

(*Id.*) (Child's name redacted). Within minutes, Father added:



**Re:** ▋ **Doctor appointment** Inbox

**Michael brown**
Sent Dec 19, 2023 at 4:39 PM

To: Janin... (viewed Dec 19, 2023 at 6:14 PM)

And what is diagnosed with rsv mean did they send it out to get cultured and give you results and did you check the lab out did you make sure all there equipment is calibrated and make sure all the techs have there certifications and get all the calibration tests and did you make sure the doctor you saw was actually a doctor. I don't no janina its sounds pretty fishy.

(**Id.**) (Child's name redacted).

After reading these messages into the record, the court admonished

Father:

> This is your writing. And this is how you respond. This is an example of what I am talking about. And I am just going to be clear for the record, a lot of what I am talking about is the high conflict in this case, which is the overarching issue in this case.
>
> * * *
>
> Do you do all of this when you take [Child] to the doctor? Do you check their machines for calibration? Do you ask the doctors for their medical credentials? Do you do all of

this every time you meet with a doctor?  I don't think you do, sir.

(N.T. Hearing, 6/14/24, at 12-13).  The court correctly observed that Father was "obstructing rather than collaborating."  (*Id.* at 13).  Consequently, the court modified the existing custody order to give Mother decision-making authority over Child's medical care and mental health providers.

On this record, we cannot say that court's decision to modify the custody order was unreasonable.  *See S.J.S., supra*.  We also decline Father's invitation to reweigh the evidence in his favor.  *See C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa.Super. 2012) (reiterating that where trial court's conclusions are reasonable as shown by record evidence, and conclusions were not result of error of law, appellate court is bound by those conclusions).  Additionally, this is a case where the parties provided ample testimony over the course of multiple, contentious hearings.  We recognize that the court made first-hand observations of the parties spanning these hearings, and we grant due deference to the conclusions based upon those observations.  *See E.B., supra*.  Thus, Father is not entitled to relief on his first claim.

In his second issue, Father asserts that the court found him in contempt of the October 12, 2023 custody order.

> The court said that [Father's] actions regarding custody were done with wrongful intent as well, including his disparaging [Mother] and attempting to manipulate the situation to his preference.  [Father's] confrontational behavior regarding [Child's] therapy choices was criticized, as well, with the court underscoring the need for such behavior to cease.

- 13 -

(Father's Brief at 25). Father insists, however, that mere noncompliance with the custody order was insufficient to establish contempt. Father proceeds to analyze each of his behaviors that formed the bases for the contempt findings, offering excuses for his conduct and an assurance that he was acting in good faith. Father concludes that the court abused its discretion by finding him in contempt. We disagree.

"In reviewing a trial court's finding on a contempt petition, we are limited to determining whether the trial court committed a clear abuse of discretion. This Court must place great reliance on the sound discretion of the trial [court] when reviewing an order of contempt." ***Rogowski v. Kirven***, 291 A.3d 50, 57 (Pa.Super. 2023) (internal citation and quotation marks omitted).

"To be in contempt, a party must have violated a court order, and the complaining party must satisfy that burden by a preponderance of the evidence." ***Id.*** (quoting ***J.M. v. K.W.***, 164 A.3d 1260, 1264 (Pa.Super. 2017)).

> Specifically, the complainant must prove certain distinct elements: (1) that the contemnor had notice of the specific order or decree which he[, or she,] is alleged to have disobeyed; (2) that the act constituting the contemnor's violation was volitional; and (3) that the contemnor acted with wrongful intent.

***Id.*** (quoting ***J.M., supra*** at 1264).

> [W]hen making a determination regarding whether a defendant acted with wrongful intent, the court should use

> common sense and consider context, and wrongful intent can be imputed to a defendant by virtue of the substantial certainty that his actions will violate the court order.

***Gross v. Mintz***, 284 A.3d 479, 492-93 (Pa.Super. 2022), *appeal denied*, \_\_\_ Pa. \_\_\_, 293 A.3d 563 (2023) (quoting ***Commonwealth v. Reese***, 156 A.3d 1250, 1258 (Pa.Super. 2017)).

"[A] mere showing of noncompliance with a court order, or even misconduct, is never sufficient alone to prove civil contempt." ***Habjan v. Habjan***, 73 A.3d 630, 637 (Pa.Super. 2013) (quoting ***Lachat v. Hinchcliffe***, 769 A.2d 481, 488 (Pa.Super. 2001)). "To impose civil contempt the trial court must be convinced beyond a reasonable doubt from the totality of evidence presented that the contemnor has the present ability to comply with the Order." ***In re Estate of DiSabato***, 165 A.3d 987, 992-93 (Pa.Super. 2017) (quoting ***Sinaiko v. Sinaiko***, 664 A.2d 1005, 1009 (Pa.Super. 1995)).

Instantly, the court found Father in contempt of the October 12, 2023 custody order on four grounds: 1) failure to provide Mother with information regarding Child's healthcare appointments/interference with Child's enrollment in individual therapy with Child and Family Focus; 2) unilaterally withholding Child from Mother on her custodial days from November 15, 2023 until December 7, 2023; 3) failing to demonstrate consistent use of Our Family Wizard to communicate with Mother; and 4) failing to return Child to Mother by 8:00 p.m. on Memorial Day, May 7, 2024. (***See*** Contempt Order, dated 6/20/24, at 1-2). Our review of the record revealed ample evidence to support

the court's findings on each ground.

Regarding Father's failure to provide Mother with information regarding Child's healthcare appointments, we have already addressed the October 2023 incident where Father took Child to a dermatology appointment, and follow-up care with the pediatrician, without informing Mother. (*See* N.T. Hearing, 3/1/24, at 39). Likewise, we discussed Father's interference with Child's enrollment in therapy at Child and Family Focus. (*Id.* at 57).

As to Father withholding Child from Mother on her custodial days in November and December 2023, the parties testified about this ordeal at length. Mother initially explained that she "put [Child] on the bus and sent her to school" on November 15, 2023, but Child was not returned to her custody until December. (*Id.* at 21). (*See also* N.T. Hearing, 6/12/24, at 39). Significantly, Father did not dispute that he withheld Child during Mother's custodial time. Rather, Father attempted to blame Child for making the unilateral decision to stay at his home during this period:

> When [Child] was supposed to go back to her mom's house after my time was up, she said there's a lot of stuff going on. Mom is drinking a lot, I'm not going. I said, what do you mean you're not going? I said, you have to go.

(N.T. Hearing, 6/12/24, at 148-49). Father claimed to have had "lengthy conversations" with Child to convince her to return to Mother. (*Id.* at 149). Father also claimed to have involved the police and OCY in an attempt to change Child's mind. On cross-examination, however, Father conceded that he did not attempt to file for emergency custody at that time, even though he

had made such requests in the past. (***See id.*** at 189-90).

Regarding the parties' usage of Our Family Wizard, Father's attorney admitted: "Sometimes they do. Sometimes they don't." (N.T. Hearing, 3/1/24, at 48). Mother added:

> He was using it. Then he stopped using it and claimed it didn't work until it would benefit him for it to work, and then all of the sudden it started working. Then he started messaging again and being as it's our only form of communication it's kind of necessary, and now he is back to pretending it doesn't work.

(N.T. Hearing, 6/12/24, at 32). Again, Father did not deny his failure to use Our Family Wizard. Instead, Father complained that technological difficulties hindered his consistent usage:

> I don't know what's going on with a lot of my apps. My Cash App is messed up. My Our Family Wizard is messed up. My Facebook sometimes is crashing. I'm having problems with a lot of my stuff, but I got the new phones. I changed some cookies, whatever that, and then I took my RMS messages off, but at home, no, I still can't get my apps to work all the way. I don't need Our Family Wizard when I'm out. I need Our Family Wizard when I'm at home. That's when I mostly need it. If I'm at like a Wawa and I get Wi-Fi, I have no problems.

(***Id.*** at 195).

Finally, Mother's testimony established that Father did not return Child to Mother by 8:00 p.m. on Memorial Day 2024. Mother explained that the October 12, 2023 custody order specifically dictated the parties' custody time on holidays, and Father needed to return Child to Mother by 8:00 p.m. on Memorial Day in 2024. (***See id.*** at 36). Father did not return Child until the

following day.  When Mother asked Father why he did not return Child sooner, "He said it was his time."  (**Id.** at 37).

Here, the custody order required Father to take certain actions, which Father failed to do.  Contrary to his assertions, this record leaves no doubt that wrongful intent could be imputed to Father.  **See Gross, supra**.  Thus, Father is not entitled to relief on his second issue.  Accordingly, we affirm the orders modifying custody and finding Father in civil contempt.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/25/2025