J-A22037-18

2018 PA Super 309

| IN THE INTEREST OF: Q.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| APPEAL OF: H.R., MOTHER | : | No. 230 EDA 2018 |

Appeal from the Order Entered December 1, 2017
in the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0003030-2017,
FID: 51-FN-376411-2009

| IN THE INTEREST OF: L.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| APPEAL OF: H.R., MOTHER | : | No. 232 EDA 2018 |

Appeal from the Order Entered December 1, 2017
in the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0003031-2017,
FID: 51-FN-376411-2009

BEFORE:   BENDER, P.J.E., NICHOLS, J., and STEVENS, P.J.E.*

OPINION BY STEVENS, P.J.E.:                    **FILED NOVEMBER 20, 2018**

Appellant, H.R. ("Mother"), files this appeal from the Order dated and entered on December 1, 2017, in the Court of Common Pleas of Philadelphia County Family Court in which the trial court, in connection with dependency proceedings concerning Mother's sons Q.R., born in December 2002, and L.R.,

_____

* Former Justice specially assigned to the Superior Court.

born in October 2011 (collectively, the "Children"), held Mother in contempt of court and incarcerated her until her adult daughter, (N.R.), surrendered N.R.'s infant daughter and Mother's non-custodial granddaughter, (N.M.), to the Philadelphia Department of Human Services ("DHS"). After review, we reverse the trial court's order.

The family came to the attention of the Department of Human Services (DHS) on August 26, 2017, following reports of Mother's alleged physical abuse of Q.R. N.T. at 9. DHS alleged that Mother had filmed Q.R. masturbating with the intent to publish such video on the Internet. *Id.* at 10-11. As testified by DHS Intake worker, Yavonna Shields, there were additional allegations of prior sexual abuse, untreated mental health issues, and harm to family pets related to Q.R.[1] *Id.* at 11-13.

Notably, Q.R. was hospitalized for mental health evaluations on three occasions since March of 2017 and was at Fairmount Behavioral Health at the time of the hearing.[2] *Id.* at 14, 25. Subsequent reports were received which included allegations relating to Mother's mental health; lack of medical care

---

[1] Ms. Shields testified to allegations of Mother "hitting and punching" Q.R. N.T. at 9-10. Ms. Shields further stated that, while Mother denied physical harm or discipline to Q.R., Mother confirmed filming Q.R. "dancing nude, but that she did not distribute it." N.T. at 17-18. Ms. Shields additionally noted that Mother acknowledged Q.R. killing his brother's turtle. *Id.* at 18.

[2] Q.R. reportedly did not wish return to Mother's care. Dependency Petition, 11/14/17, at ¶¶5 b, c, i.

as to Q.R. and L.R. for an extended period of time; physical discipline of Q.R.;[3]
lack of treatment for Q.R. for past injuries and sexual abuse; Q.R.'s desire to
harm animals; lack of compliance with the safety plan and refusal to accept
in-home services and supports; absence of a bond between Mother and Q.R.;
and the unkempt nature of the home.[4]  Dependency Petition, 11/14/17, at
¶¶5j, k.

DHS filed dependency petitions pertaining to Q.R. and L.R. on November
14, 2017.  An adjudicatory hearing concerning these petitions was held on
December 1, 2017.  Mother was present and represented by Elizabeth Larin,
Esquire.  Children, almost fifteen years old and six years old at the time,
although not present, were represented by a Child Advocate, Brian Johnson,
Esquire.[5]  DHS presented the testimony of DHS Intake worker, Yavonna

---

[3] Ms. Shields noted observation of scars on Q.R.'s right shoulder, left thigh,
and right thigh, which Q.R. attributed to Mother branding him with a fork as
a result of his playing with fire.  Mother also hit him with a metal broom and
burned him with a curling iron.  N.T. at 18-19.

[4] On October 3, 2017, DHS observed "that [Q.R.]'s bedroom lacks a bed, and
is strewn with clothes and trash; that [Mother] and [L.R.]'s bedroom was
unkempt and contained a full-size bed on a broken metal frame and a deflated
air mattress; that the home was unkempt and strewn with trash and dirty
laundry on the floors; and that there were also several bags of trash and dirty
diapers in the home."  *Id.* at ¶5 l.

[5] Notably, Attorney Johnson's office, the Defender's Association Child
Advocacy Unit, was appointed by the trial court on November 15, 2017, as
counsel and guardian *ad litem* to represent the Children.  Such appointment
was to represent the Children's interests in connection with proceedings
related to abuse, dependency, termination of parental rights, adoption and/or
custody.  Order Appointing Counsel, 11/15/17.

Shields, for purposes of the adjudication. Prior to the completion of Ms. Shields' testimony, Mother agreed to an adjudication of dependency and commitment.[6, 7] Notes of Testimony ("N.T."), 12/1/17, at 20. The parties stipulated that had Ms. Shields continued to testify she would have testified to the facts set forth in the dependency petitions. There was not a stipulation, however, as to the veracity of such facts. *Id.* at 21. Thereafter, DHS raised

_____

While this appeal was pending, this Court extended the requirements of *In re Adoption of L.B.M.*, 639 Pa. 428, 432, 161 A.3d 172, 174 (2017), and its progeny to dependency actions generally. *See L.B.M.*, *supra* (the issue decided was whether 23 Pa.C.S.A. § 2313(a), which mandates the appointment of counsel for children involved in contested involuntary termination of parental rights proceedings, is satisfied by the appointment of a GAL provided that the GAL is an attorney.); *see also In re T.S.*, ___ Pa. ____, 192 A.3d 1080 (2018) (holding that the trial court did not err in allowing the children's GAL to act as their sole representative during the termination proceeding because, at two and three years old, they were incapable of expressing their preferred outcome.); *In re J'K.M.*, 191 A.3d 907 (Pa.Super. 2018) (reversing order denying appointment of a separate counsel for dependency proceedings where there was a conflict between the child's best interests and legal interests). Instantly, upon review, we discern no conflict between Q.R.'s preference and his best interests. However, the preference of L.R., who was six years old at the time of the proceeding in question, is unknown, and the certified record does not suggest his preference. If the trial court determines there is a conflict between his preference and his best interests, L.R. must have separate legal counsel to advocate for those disparate interests in future proceedings.

[6] Attorney Johnson supported the adjudication and commitment of the Children. Specifically, in response to inquiry from the court, he replied, "I am in agreement with the stipulations as to [the Children's] full commits. And the recommendations for the children then for mom. . . ." N.T. at 49.

[7] Mother does not challenge the adjudication of dependency on appeal.

concern pertaining to who resided in the household. The trial court, finding N.R. and N.M. resided in Mother's household, thereafter held Mother in custody until N.R. surrendered N.M. to DHS.[8] *Id.* at 28-44. In relevant part, the following exchange then occurred:

> **THE COURT**: All right. This is what's going to have to happen. Where is the baby currently?
>
> (Brief Pause)
>
> **THE COURT**: Where's the baby?
>
> (Brief Pause)
>
> **THE COURT**: [Mother]?
>
> **[MOTHER]**: With her mother.
>
> **THE COURT**: Where is her mother?
>
> **[MOTHER]**: I don't know.
>
> **THE COURT**: Okay. Well, that's going to be a problem for you because you're going to be on this van to State Road. I'm going to hold you in State[']s custody until I get the baby.
>
> **[MOTHER]**: I just don't know where she is, Your Honor.
>
> **THE COURT**: Okay. Well, that's all right, you'll be able to make a phone call and get her here.
>
> **[MOTHER]**: Okay.
>
> **THE COURT**: Because the baby absolutely has to come into care because I do not necessarily believe the fact that the baby's not living there.

---

[8] The court additionally expressed approval of DHS' oral request for the indicated CPS abuse reports of August 26, 2017 to be founded. *Id.* at 44-47. We observe, however, that the trial court did not enter a written order reflecting a finding of abuse pursuant to 23 Pa.C.S.A. § 6303. Mother appeals this issue separately at Superior Court No. 229 EDA 2018.

. . .

**THE COURT**: All right, so this is what has to happen. I'm going to hold [Mother] until [N.M.] is here for DHS.

**MS. LARIN**: Your Honor, my client has indicated she would call, give the phone number. DHS has the number.

**THE COURT**: Okay. She can call and phone and everything like that, but I need to ensure that I get the baby and mom hasn't been one to cooperate. So I can't give her the benefit of the doubt that she's going to cooperate based on her actions up until this point.

DHS has had an active investigation. And one of the reasons we got a continuance and I think I said this at the last hearing, with all the efforts that DHS made to try to complete their investigation I thought that they should have had a motion to compel even before we got to adjudicatory. I can't give mom the benefit of the doubt [Mother] that she's going to cooperate. And I'm not going to chance when there's a two-month-old baby. Not doing it.

**MS. LARIN**: And I understand, but could we have a motion to compel against [N.R.] because [N.R.] is a grown [sic]. She's twenty-six-years-old.

**THE COURT**: She's a household member in which DHS is doing an investigation. I don't have [N.R.] before the [c]ourt, but I do have [Mother] So, I'm going to have [Mother] be held in custody until the baby gets here and then we're good.

**MS. LARIN**: Your Honor, could I put my objection on the record.

**THE COURT**: You could absolutely put your objection on the record.

**MS. LARIN**: And, it would be that my client cannot guarantee that [N.R.] would come here. She's not able to purge what you're requesting of her. So I don't believe it's appropriate to hold her to get another adult to come into the home that's not --

**THE COURT**: I find that the baby is a household member. And I think [H.R.] needs to make the appropriate phone calls in order that DHS may be able to fully assess the safety of [N.M.]

- 6 -

And so, I understand what you're saying, but because of that, if I thought for certain that [N.R.] lived elsewhere then I would not do that, but I absolutely believe the testimony of Ms. Shields and based on the information of the two other minors that were in that home, I believe the baby lives there.

**MS. LARIN**: I understand, but we have no way of making [N.R.] come here. She wasn't raised by her mother. She doesn't necessarily -- she might not come.

**THE COURT**: But she lives there. But she lives there.

**MS. LARIN**: Couldn't we just have a police assist to the home?

**THE COURT**: No. Because I don't think that -- she's not cooperative. To do a police assist there has to be some level of cooperation. Half the time I don't think she was even allowing DHS to like go in the home. She wasn't opening the door.

**[MOTHER]**: That's not true.

**THE COURT**: I think that --

Okay. Let me tell you something --

**MS. LARIN**: Could we just have police go right now?

**THE COURT**: No, because I want the baby brought here. I'm not having the police go now. I have grandmom and that's what we're going to do.

. . .

**THE COURT**: . . .

I'm just holding [Mother] until such time [N.M.] is produced to the Department. And once she is – once DHS has the baby then [Mother] can be released from custody.

. . .

N.T. at 33-34, 41-44, 47.

Specifically, the court's Order, signed and entered on the same date as the hearing, indicated the following:

Court is holding [Mother] in contempt of court, and [Mother] is permitted to be released once [N.M.] is brought down to DHS. DHS to notify the sheriffs unit on[c]e [N.M.] is obtained. If [Mother] is not released[,] [Mother] is to be brought down to the next court date.

Order of Adjudication and Disposition – Child Dependent, 12/1/17, at 2.[9]

On December 29, 2017, Mother, through counsel, filed timely notices of appeal, as well as concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte* on January 23, 2018. The trial court filed a Rule 1925(a) opinion on May 31, 2018.[10]

On appeal, Mother raises the following issues for our review:

1. Did the trial court err by ordering [Mother]'s incarceration until [Mother]'s daughter, N.R., surrendered N.R.'s infant daughter and [Mother]'s non-custodial granddaughter, N.M., to DHS despite the trial court's lack of authority pursuant to the Juvenile Act to compel [Mother] to surrender a non-custodial child? [**See**] 42 Pa.C.S.[A.] § 6301.

_____

[9] The certified record reveals that Mother was released on December 2, 2017, the following day. We observe that neither the trial court nor any party asserts that the issue is moot. Nevertheless, we agree with Mother that an exception to the mootness doctrine applies which allows us to reach the merits. **See In re D.A.**, 801 A.2d 614, 616-17 (Pa.Super. 2002) (addressing appeal of dependency adjudication on the merits, despite dependency case being closed in the interim as: Court will decide questions that otherwise have been rendered moot when one or more of the following exceptions to the mootness doctrine apply: 1) the case involves a question of great public importance, 2) the question presented is capable of repetition and apt to elude appellate review, or 3) a party to the controversy will suffer some detriment due to the decision of the trial court).

[10] The trial court filed a single opinion addressing the instant appeals involving Mother's incarceration and Mother's separate challenge to the court's finding of abuse.

The trial court answers in the negative.

2. Did the trial court err in ordering [Mother]'s incarceration until [Mother]'s daughter, N.R., surrendered N.R.'s infant daughter and [Mother]'s non-custodial granddaughter, N.M., to DHS in contravention of [Mother]'s right to liberty, privacy, and due process of law pursuant to Article 1, Section 1 of the Pennsylvania Constitution? [*See*] Pa. Const. Art. 1, § 1.

The trial court answers in the negative.

3. Did the trial court err by ordering [Mother]'s incarceration until [Mother]'s daughter, N.R., surrendered N.R.'s infant daughter and [Mother]'s non-custodial granddaughter, N.M., to DHS in contravention of [Mother]'s right to liberty, privacy, and due process of law pursuant to the 14th Amendment of the United States Constitution? [*See*] U.S. CONST. amend. XIV.

The trial court does not answer this question.

4. Did the trial court err by making a credibility determination that N.R. and N.M. resided with [Mother] by relying in part on out-of-court statements purportedly made by L.R. and [Mother]'s second son, Q.R., and memorialized in Child Protective Services ("CPS") reports, despite the fact that [Mother]'s counsel did not stipulate to the veracity of these reports, these reports were not admitted into evidence, and DHS did not establish the proper foundation for these reports?

The trial court does not answer this question.

5. Did the trial court err by relying on inadmissible hearsay, namely, the purported out-of-court statements made by L.R. and [Mother]'s second son, Q.R., and memorialized in these CPS reports, to determine that [Mother]'s daughter, N.R., and N.R.'s daughter and [Mother]'s non-custodial granddaughter, N.M., resided with [Mother] at the time of the hearing? [*See*] Pa.R.E. 802.

The trial court does not answer this question.

6. Did the trial court err by denying [Mother]'s procedural due process right to notice regarding whether her adjudicatory hearing was for criminal or civil contempt?

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

7. Did the trial court err and violate [Mother]'s due process rights under the law by creating a purge condition for contempt, namely, the surrender of [Mother]'s non-custodial granddaughter, N.M., where N.M.'s surrender was not within [Mother]'s control? [**See Ingebrethsen**], 661 A.2d at 405.

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

8. To the extent the trial court entered a finding of civil contempt against [Mother], did the trial court err by denying [Mother]'s procedural due process right to notice of the decree that she allegedly disobeyed? [**See Lachat v. Hinchcliffe**, 769 A.2d 481, 489 (Pa.Super. 2001)].

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

9. To the extent the trial court entered a finding of civil contempt against [Mother], did the trial court err by denying [Mother]'s procedural due process right to a rule to show cause? [**See Lachat**], 769 A.2d at 489.

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

10. To the extent the trial court entered a finding of civil contempt against [Mother], did the trial court err by denying [Mother]'s procedural due process right to an answer and hearing? [**See Lachat**], 769 A.2d at 489.

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

11. To the extent the trial court entered a finding of civil contempt against [Mother], did the trial court err by denying [Mother]'s procedural due process right to an adjudication and rule absolute? [**See Lachat**], 769 A.2d at 489.

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

12. To the extent the trial court entered a finding of civil contempt against [Mother], did the trial court err and violate [Mother]'s right to due process because its order imposing civil contempt against [Mother] is too vague and cannot be enforced?

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

13. To the extent the trial court entered a finding of civil contempt against [Mother], did the trial court err because its finding was not supported by a preponderance of the evidence that the court order which [Mother] purportedly violated was definite, clear, and specific? [*See Lachat*], 769 A.2d at 488-89.

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

14. To the extent the trial court entered a finding of civil contempt against [Mother], did the trial court err because its finding was not supported by a preponderance of the evidence that [Mother] had notice of the specific order which she is alleged to have disobeyed? [*See Lachat*], 769 A.2d at 488-89.

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

15. To the extent the trial court entered a finding of civil contempt against [Mother], did the trial court err because its finding was not supported by a preponderance of the evidence that the act constituting the alleged violation was volitional? [*See Lachat*], 769 A.2d at 488-89.

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

16. To the extent the trial court entered a finding of civil contempt against [Mother], did the trial court err because its finding was not supported by a preponderance of the evidence that [Mother] acted with wrongful intent? [*See Lachat*], 769 A.2d at 489.

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

17. To the extent the trial court entered a finding of criminal contempt against [Mother], did the trial court err by denying [Mother] her procedural due process right to prior notice that a contempt hearing was going to be held? [**See Com. v. Jackson**], 532 A.2d 28, 32-33 ([Pa.Super.] 1987).

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

18. To the extent the trial court entered a finding of criminal contempt against [Mother], did the trial court err by denying [Mother] her procedural due process right to be adequately notified of the specific accusations against her and afforded a reasonable time to prepare [Mother]'s defense prior to the contempt hearing? [**See Jackson**], 532 A.2d at 32-33.

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

19. To the extent the trial court entered a finding of criminal contempt against [Mother], did the trial court err by denying [Mother] her procedural due process right to bail? [**See Com. v. Ashton**], 824 A.2d 1198, 1203 ([Pa.Super.] 2003).

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

20. To the extent the trial court entered a finding of criminal contempt against [Mother], did the trial court err by denying [Mother] her procedural due process right to the assistance of adequate representation through criminal defense? [**See**] U.S. CONST. amend. VI; [**see also Ashton**], 824 A.2d at 1203; Pa.R.Crim.P. 122.

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

21. To the extent the trial court entered a finding of direct criminal contempt against [Mother], namely, that [Mother]'s purported

misconduct occurred in the court's presence, did the trial court err because its finding is not supported by evidence beyond a reasonable doubt that [Mother] engaged in misconduct in the presence of the court? [*See*] 42 Pa.C.S.[A.] § 4132(3); [*Ashton*], 824 A.2d at 1202.

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

22. To the extent the trial court entered a finding of direct criminal contempt against [Mother], did the trial court err because its finding is not supported by evidence beyond a reasonable doubt that [Mother] intended to obstruct justice? [*See*] 42 Pa.C.S.[A.] § 4132(3); [*Ashton*], 824 A.2d at 1202.

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

23. To the extent the trial court entered a finding of direct criminal contempt against [Mother], did the trial court err because its finding is not supported by evidence beyond a reasonable doubt that [Mother] actually obstructed justice? [*See*] 42 Pa.C.S.[A.] § 4132(3); [*Ashton*], 824 A.2d at 1202.

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

24. To the extent the trial court entered a finding of indirect criminal contempt against [Mother], namely, that [Mother]'s purported misconduct occurred outside of the court's presence, did the trial court err because its finding is not supported by evidence beyond a reasonable doubt that the underlying order giving rise to the criminal contempt finding was definite, clear, and specific regarding the conduct prohibited? [*See Ashton*], 824 A.2d at 1203.

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

25. To the extent the trial court entered a finding of indirect criminal contempt against [Mother], did the trial court err because its finding is not supported by evidence beyond a reasonable doubt

that [Mother] had notice of the specific order? [**See Ashton**], 824 A.2d at 1203.

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

26. To the extent the trial court entered a finding of indirect criminal contempt against [Mother], did the trial court err because its finding is not supported by evidence beyond a reasonable doubt that [Mother]'s alleged misconduct was volitional? [**See Ashton**], 824 A.2d at 1203.

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

27. To the extent the trial court entered a finding of indirect criminal contempt against [Mother], did the trial court err because its finding is not supported by evidence beyond a reasonable doubt that [Mother] acted with wrongful intent? [**See Ashton**], 824 A.2d at 1203.

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

28. To the extent the trial court entered a finding of criminal contempt against [Mother], did the trial court err because less drastic measures would have sufficed, such as [Mother]'s request that [Mother] call N.R. and inform N.R. of the court's order for N.M.'s surrender? [**See Com. v. Jones**], 700 A.2d 1008, 1013 ([Pa.Super.] 1997).

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

29. To the extent the trial court entered a finding of criminal contempt against [Mother], did the trial court err because less drastic measures would have sufficed, such as the request by [Mother]'s counsel that a police escort secure the surrender of N.M.? [**See Com. v. Jones**], 700 A.2d 1008, 1013 ([Pa.Super.] 1997).

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

30. To the extent the trial court entered a finding of criminal contempt against [Mother], did the trial court err and violate [Mother]'s rights under the Confrontation Clause of the U.S. Constitution because its finding relied in part on the hearsay statements of L.R. and Q.R., memorialized in the CPS reports, and because it denied [Mother] the opportunity to review certain of these relied-upon reports? [*See*] U.S. CONST. amend. VI; [***Crawford v. Washington***], 541 U.S. 36, 68-69 (2004); [***Melendez-Diaz v. Massachusetts***], 557 U.S. 305, 310-29 (2009).

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

31. To the extent the trial court entered a finding of criminal contempt against [Mother], did the trial court err by imposing a flat sentence that terminated upon the surrender of [Mother]'s noncustodial granddaughter, N.M., to DHS because it violated the Sentencing Code, which requires that any sentence have both a minimum and maximum term? [*See*] 42 Pa.C.S.[A.] §§ 9755(b), 9756(b), 9757; [***Com. v. Cain***], 637 A.2d 656, 658-59 [(Pa.Super.] 1994).

The trial court answers that it did not hold [Mother] in contempt despite the court's explicit statement that it was doing so. Order at 2.

Mother's Brief at 4-18.[11]

Our standard of review for dependency cases is as follows:

The standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

---

[11] We note that the trial court does not address all of Mother's issues in its opinion.

- 15 -

*In re R.J.T.*, 608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010) (citations omitted);

*see also In the Interest of L.Z.*, 631 Pa. 343, 111 A.3d 1164, 1174 (2015).

"The trial court is free to believe all, part, or none of the evidence presented

and is likewise free to make all credibility determinations and resolve conflicts

in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004)

(citation omitted).

> [T]o adjudicate a child dependent, a trial court must determine, by clear and convincing evidence, that the child:
>
>> is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk.
>
> 42 Pa.C.S.A. § 6302(1). "Clear and convincing" evidence has been defined as testimony that is "so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re C.R.S.,* 696 A.2d 840, 843 (Pa.Super. 1997) (citation omitted).
>
> In accordance with the overarching purpose of the Juvenile Act "[t]o preserve the unity of the family wherever possible," *see* 42 Pa.C.S.A. § 6301(b)(1), "a child will only be declared dependent when he is presently without proper parental care and when such care is not immediately available." *In re R.T.,* [ ] 592 A.2d 55, 57 (Pa.Super. 1991) (citation omitted). This Court has defined "proper parental care" as "that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child." *In re C.R.S., supra* at 845 (citation omitted).

*In re A.B.*, 63 A.3d 345, 349 (Pa.Super. 2013).

Section 6301 of the Juvenile Act states:

**(a)    Short title.--**This chapter shall be known and may be cited as the "Juvenile Act."

**(b)    Purposes.--**This chapter shall be interpreted and construed as to effectuate the following purposes:

(1) To preserve the unity of the family whenever possible or to provide another alternative permanent family when the unity of the family cannot be maintained.

(1.1) To provide for the care, protection, safety and wholesome mental and physical development of children coming within the provisions of this chapter.

(2) Consistent with the protection of the public interest, to provide for children committing delinquent acts programs of supervision, care and rehabilitation which provide balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable children to become responsible and productive members of the community.

(3) To achieve the foregoing purposes in a family environment whenever possible, separating the child from parents only when necessary for his welfare, safety or health or in the interests of public safety, by doing all of the following:

> (i) employing evidence-based practices whenever possible and, in the case of a delinquent child, by using the least restrictive intervention that is consistent with the protection of the community, the imposition of accountability for offenses committed and the rehabilitation, supervision and treatment needs of the child; and
>
> *(ii) imposing confinement only if necessary and for the minimum amount of time that is consistent with the purposes under paragraphs (1), (1.1) and (2).*

(4) To provide means through which the provisions of this chapter are executed and enforced and in which the parties are assured a

fair hearing and their constitutional and other legal rights recognized and enforced.

42 Pa.C.S.A. § 6301 (emphasis added).

Further, Section 6351 of the Act, pertaining to confinement, provides in relevant part:

> **(c) Limitation on confinement.--**Unless a child found to be dependent is found also to be delinquent he shall not be committed to or confined in an institution or other facility designed or operated for the benefit of delinquent children.

42 Pa.C.S.A. § 6351(c). Section 6352 additionally addresses the confinement of delinquent children and appropriate disposition "consistent with the protection of the public interest and best suited to the child's treatment, supervision, rehabilitation and welfare, which disposition shall, as appropriate to the individual circumstances of the child's case, provide balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable the child to become a responsible and productive member of the community." 42 Pa.C.S.A. § 6352(a).

In support of its decision to incarcerate Mother absent her surrender of her grandchild N.M., the trial court indicated that it did not find Mother in contempt and suggested that, based on credibility determinations, it temporarily incarcerated Mother in the best interests, welfare, and safety of N.M. Trial Court Opinion, 5/31/18, at 5. The trial court apparently based its decision on the provision of confinement under Section 6301(b)(3)(ii) of the Juvenile Act, for the court reasoned as follows:

Mother testified her infant grandchild did not reside in the home. The [c]ourt did not find Mother's testimony her adult child an[d] the infant grandchild did not reside in the home credible. Testimony of the social worker stated Q.R. and L.R. advised her the infant grandchild resided in the Mother's home. Furthermore, the social worker testified there was an accumulation of baby supplies and disposed diapers to evidence an infant resided in Mother's home. The [c]ourt surmised the infant grandchild to be a member of the Mother's household and the infant grandchild'[s] well-being and safety were at issue. The [c]ourt ordered an Order of Protective Custody (OPC) for an infant residing in the home in an abundance of caution of safety for the children. The [c]ourt[,] based on testimony of Mother's uncooperative behavior, ordered Mother, [g]randmother of the infant, to be held until the infant grandchild residing in Mother's home was produced to the Department of Human Services. The [c]ourt held an Adjudicatory Hearing as agreed by Counsel for Mother and the Department of Human Services.

The [c]ourt ordering Mother's incarceration until infant granddaughter to Department of Human Services did not contravention of [sic] Mother's right to liberty, privacy, and due process of law pursuant to Article 1, Section 1 of the Pennsylvania Constitution. The [c]ourt reasoned the severity of the testimony of social worker and the safety of the infant grandchild outweighed the temporary custody of Mother to compel the undisclosed location of the infant grandchild. The [c]ourt noted Mother was to be released from custody forthwith upon the confirmation of the Department of Human Service[s'] custody of the infant grandchild whose safety was at issue. The [c]ourt did not enter a finding of civil nor [sic] criminal contempt. The [c]ourt acted to employ the least restrictive intervention that is consistent with the protection of the community, by separating the infant grandchild from the caregivers of the delinquent home as it was when necessary for his welfare, safety or health or in the interests of public safety.

Trial Court Opinion, 5/31/18, at 5 (citations to N.T. omitted).

In her first issue, Mother argues the trial court exceeded its authority under the Juvenile Act by incarcerating her and compelling her to surrender a non-custodial child. Mother's Brief at 29. Mother argues

[t]he Act's confinement power is limited to the confinement of *delinquent children*, and only when specific facts are present. [**See, e.g.**], 42 Pa.C.S.[A.] §§ 6301(3)(ii) (providing for the confinement of a child "only if necessary" and for a minimum amount of time"); 6351(c) ("Unless a child found to be dependent is found also to be delinquent[,] he shall not be committed to or confined to an institution or other facility. . ."); 6352 (providing for confinement of children only where necessary). The trial court improperly seeks to transform the limited scope of its confinement authority to include the confinement of a non-custodial grandmother lacking any parental rights. Such a reading would eviscerate the plain language and expressly-stated purpose of the Juvenile Act.

*Id.* at 31-32 (emphasis in original). We agree.

The Juvenile Act addresses confinement in terms of delinquent children. The Act does not provide for the incarceration of a non-custodial grandparent to compel a grandchild's surrender. Notably, N.M. was not even a subject child of the adjudicatory hearing before the trial court. Therefore, as "[d]ispositions which are not set forth in the Act are beyond the power of the juvenile court[,]" the trial court's actions were erroneous. *In re J.J.*, 848 A.2d 1014, 1016-17 (Pa.Super. 2004). Because we find the Juvenile Act on its face does not support the trial court's incarceration of Mother, we find the trial court's Order incarcerating Mother to be void and need not address the remainder of Mother's issues. *See In re R.D.R.*, 876 A.2d 1009, 1016 (Pa.Super. 2005) (stating "[a]n order which does not comport with one or more of the [Juvenile Act's] enumerated options is void for lack of statutory authority.")

Accordingly, for the reasons set forth, we reverse the Order of the trial court.

Order reversed.

P.J.E. Bender joins the Opinion.

Judge Nichols concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/20/18</u>