J-A07008-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: O.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.N.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1595 MDA 2024 |

Appeal from the Dispositional Order Entered October 1, 2024
In the Court of Common Pleas of Centre County Juvenile Division at
No(s):  CP-14-DP-0000019-2024

BEFORE:  BOWES, J., OLSON, J., and STABILE, J.

MEMORANDUM BY BOWES, J.:                                    **FILED: APRIL 29, 2025**

A.N.S. ("Mother") appeals from the order adjudicating dependent her minor daughter, O.J., born January 2021.[1]  We affirm.

By way of background, the Centre County Children and Youth Services Agency ("CYS") has been engaged with Mother in varying capacities since 2011, including with respect to two older half-sisters of O.J.  From then until 2020, when the family temporarily moved out of Centre County, CYS investigated and ultimately closed approximately seven referrals, some of which concerned Mother's vagrancy.  When Mother returned to Centre County with the girls after O.J. was born, CYS reopened the family's case relating to the family.  The juvenile court ably summarized the history of the agency's involvement from that point forward:

_____

[1] O.J.'s father, C.J. ("Father"), has not appealed.

[I]n February of 2023, [CYS] began receiving referrals involving concerns of homelessness, truancy[,] and marijuana use in the presence of the children, including O.J. Although housing security issues were present, the family was able to find suitable housing with a friend. After investigation, [CYS] did not find any truancy concern. Mother had a medical marijuana card, so [CYS]'s concern regarding the marijuana referral was also addressed. [CYS] closed with the family in early April of 2023. Over the course of the next several months, [it] received numerous additional referrals concerning various issues, including homelessness and alleged heroin use by [Mother and Father]. [CYS] investigated the allegations. Although the family was struggling with stable housing, the situation was remedied. Mother and Father were not cooperative with respect to requested drug testing, but both parents appeared to be sober in dealings with [CYS] in this time period, and the agency closed with the family.

CYS again began receiving referrals in December of 2023 and continuing into early 2024. There were allegations of physical abuse by Father toward O.J.'s [half-]siblings, which Father denie[d]. There were also allegations that both parents were using heroin, that Father was drinking heavily, and that the family was again struggling with housing insecurity. The parents agreed to drug-testing at times but at other times refused. The allegations of heroin use were never substantiated. Father, who did not have a medical marijuana card, tested positive for marijuana. Mother, who had a medical marijuana card, continued to use marijuana.

It was confirmed that the family continued to struggle with homelessness in February and March of 2024. As of March 8, 2024, the family was completely homeless. CYS worked with the family to ensure the children had a safe and stable place to stay. [O.J.'s sisters] went to stay with their father. Mother and Father did not agree to O.J. doing so. Although they were initially reluctant, they ultimately agreed to stay at a shelter with O.J. to ensure she had safe and stable housing.

. . . [I]n April of 2024, CYS received an additional referral based on an allegation that Father had inappropriately touched one of Mother's other children . . . and that Mother was aware it had occurred. Mother and Father den[ied] these allegations. CYS implemented a safety plan requiring that Mother and Father be

supervised with the children. The family was opened for protective services. A safety plan hearing was held on April 12, 2024[,] and a safety plan order was entered following the hearing. [CYS] found the referral allegations to be indicated after investigation. On May 16, 2024, CYS met with Mother and Father to inform them of the [agency's] determination, discuss services to be offered by the agency, and discuss [its] request that Father have a sexual offender evaluation. Father reacted very angrily, and both parents were uncooperative. They expressed that they did not want to work with the agency in any capacity and that they would no longer cooperate with CYS.

Juvenile Court Opinion, 11/25/24, at 4-6 (some capitalization altered).

Three days later, on May 19, police responded to a call and discovered O.J., then three years old and wearing only a diaper, standing alone near a busy road intersection. The officers believed that O.J. had been outside for approximately one hour. Several additional hours later, they were able to locate the apartment to where Mother and Father had recently moved two weeks prior, unbeknownst to CYS. OJ.'s return surprised Mother, who was not aware that the child had left the Apartment. Mother indicated that she had overslept, and O.J. may have escaped when Father left for work earlier that morning. During CYS's inquiry into the incident, it noted that the parents did not have any baby-proofing items within the apartment.

The juvenile court then recounted as follows:

Father blamed CYS when he learned that O.J. had eloped from the apartment and was found alone at the intersection. Nonetheless, both Father and Mother initially cooperated with agency efforts to begin addressing the situation. A safety plan was implemented requiring Mother and Father to be supervised with O.J. Paternal grandmother was the designated supervisor. On the same day as the May 19 incident, [CYS] purchased babyproofing equipment, including a gate for the stairs and

- 3 -

doorknob covers to prevent O.J. from opening the doors on her own.  Although he was initially hesitant, Father installed all of the baby proofing equipment purchased by the agency.

CYS was able to confirm that the babyproofing equipment remained in place at two additional home visits [several days later] in May.  During a home visit on May 20, both parents acknowledged that the May 19 incident involving O.J. was serious; they also indicated it had been an isolated incident, and they would not agree to continuation of a safety plan.  A safety plan petition was filed by the agency.

A safety plan hearing was held on May 22, 2024[,] and a safety plan order was entered by the court requiring that Mother and Father continue to be supervised with O.J.  By that time, CYS had received another referral regarding [one of O.J.'s half-siblings].  CYS shared these allegations with Mother and Father on the day of the May 22 safety plan hearing.  At a home visit the next day, May 23, 2024, CYS observed that the child-safety equipment was still in place.  The agency planned to request that Mother and Father engage in parenting education and work with custody monitoring services.  In trying to discuss the status of the various referrals and the need for ongoing protective services, however, Father became angry and verbally aggressive and ordered the caseworkers out of the apartment.  From that time through the date of the last dependency hearing [more than four months later], Father and Mother continued to deny the agency access to the apartment and were generally uncooperative with [CYS]'s efforts to ensure safety for O.J. and her siblings.

*Id*. at 6-7 (some capitalization altered).

CYS thereafter filed petitions to adjudicate O.J. and her two sisters dependent on June 21, 2024.  A hearing was held on the petitions over the course of two days on August 13, 2024 and September 30, 2024.[2]  At the

_____

[2] O.J. and her siblings were each represented by Parviz Ansari, Esquire, as guardian *ad litem*.  Attorney Ansari testified that he did not have any conflict serving in that role as to all children.  *See* N.T. Hearing, 8/13/24, at 7.

conclusion of the second day, the juvenile court adjudicated O.J. dependent but dismissed the petitions as to her siblings. Pursuant to the order of adjudication and disposition, legal custody of O.J. transferred to CYS, whereas physical custody remained with Mother and Father.

Mother timely filed both a notice of appeal and a statement of errors pursuant to Pa.R.A.P. 1925(a)(2)(i). The juvenile court thereafter authored a responsive opinion. Mother presents a single issue for review: "Did the [juvenile] court commit an abuse of discretion and/or error of law in concluding that there was clear and convincing evidence to justify finding a dependent child on the basis that the child was without proper parental care and control?" Mother's brief at 6 (some capitalization altered).

We begin with the pertinent legal principles:

> Our standard of review for a dependency adjudication requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. We therefore review for an abuse of discretion. A trial court abuses its discretion if, in reaching a conclusion, it overrides or misapplies the law, or the record shows that the trial court's judgment was either manifestly unreasonable or the product of partiality, prejudice, bias or ill will.

**_Interest of J.R._**, ___ A.3d ___, 2025 WL 797841 at *4 (Pa.Super. March 13, 2025) (cleaned up).

CYS's petition requested that O.J. be found dependent pursuant to subsection (1) of the Juvenile Act's definition of "dependent child." This applies to a child who:

- 5 -

is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S. § 6302(1). To adjudicate a child dependent, a court must determine that this requirement is satisfied by clear and convincing evidence.

*See Interest of Q.R.*, 199 A.3d 458, 467 (Pa.Super. 2018). In that vein:

"Clear and convincing" evidence has been defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.

[Further, i]n accordance with the overarching purpose of the Juvenile Act to preserve the unity of the family wherever possible . . ., a child will only be declared dependent when he is presently without proper parental care and when such care is not immediately available. This Court has defined "proper parental care" as that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child.

*Id*. at 467-68 (cleaned up).

The juvenile court thoroughly and cogently explained the rationale for its holding in its Rule 1925(a) opinion. It began by recounting the pertinent facts above, highlighting that Mother and Father had struggled to provide adequate housing for O.J. for many months leading up to the May 19, 2024 incident, and that they removed O.J. from the shelter without informing the agency. *See* Juvenile Court Opinion, 11/25/24, at 7. The court opined that

on the date that O.J. left the residence unattended, "there can be no question that this three-year-old child did not on that occasion have proper parental control likely to protect her from serious harm or injury." *Id*. at 7-8. When further considering whether the parents were able to provide proper care and control for O.J., the court emphasized that neither parent was aware of O.J.'s departure, acknowledged responsibility for the situation, or provided assurances that something like this would not happen again. *Id*. at 8. It also noted that CYS, and not Mother or Father, purchased the childproofing instrumentalities that Father reluctantly implemented. *Id*. The court concluded:

> Since the May 19 incident, Mother and Father have been supervised in their care of O.J. pursuant to a court-ordered safety plan. Rather than cooperate with the agency's efforts to ensure the safety concerns for O.J. are addressed, however, they have refused the agency access to the home and have refused to participate in services with recommended providers. CYS is thus unable to ensure that Mother and Father are remedying the circumstances that [led] to the May 19 incident and is unable to ensure the safety of three-year-old O.J. in the absence of court-ordered services.
>
> In sum, based on the totality of the circumstances leading up to the May 19, 2024 incident as well as the incident itself and conduct of the parents thereafter, the court concluded that the parents' conduct placed O.J.'s health, safety[,] and welfare at risk, and that O.J. lacked immediate proper care and control.

*Id*. at 8-9 (some capitalization altered).

In contending that the court erred, Mother acknowledges the incident wherein O.J. was found alone outside, but states that she and Father have since implemented safety measures and that there was no evidence of any

additional problems arising thereafter. *See* Mother's brief at 17. She contends that the juvenile court placed undue emphasis on her family's history of homelessness, thus improperly focusing on past events at the expense of determining the necessity of dependency as of the date of the hearing. *Id*. She also maintains that if the vagrancy concerns were a basis for dependency as to O.J., the court should have likewise granted the CYS petitions filed on behalf of O.J.'s sisters for the same reason. *Id*. at 17-18. Similarly, Mother argues that to the extent the court found that dependency was appropriate based upon the failure of the parents to cooperate with CYS, that was erroneous because there had been no issues since they babyproofed the home after the May 19 incident. *Id*. at 18-19. She further accuses the court of relying solely on the volume of referrals made against her family in rendering its judgment.[3] *Id*. at 19.

Upon review, we conclude that the juvenile court did not abuse its discretion in finding O.J. dependent. The record supports its determination that the actions of both Mother and Father placed O.J. in a position wherein she was "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for h[er] physical, mental, or emotional health, or morals." 42 Pa.C.S. § 6302. Despite Mother's averment to this Court that she has remedied all concerns of CYS arising from the May 19, 2024 episode, the fact remains that she and Father have

---

[3] This Court also received separate advocacy briefs from O.J.'s counsel and counsel for CYS. Both argue for affirmance of the juvenile court's order.

prevented the agency from ascertaining if this is, in fact, true. CYS simply cannot determine if the parents have continued to maintain a safe living environment for a young child. We similarly reject Mother's assertion that the court merely relied upon her troubled history in reaching its decision. To the contrary, the court specifically articulated at the hearing that while it was given information concerning the lengthy timeline of referrals, it carefully excluded from consideration those that were closed by CYS without evidentiary support and those irrelevant to O.J., which constituted all of them prior to 2023. *See* N.T. Hearing, 9/30/24, at 84-85.

We are further not convinced that the juvenile court was inconsistent or somehow erred by granting CYS's dependency petition as to O.J. but denying those filed on behalf of her sisters. The court concluded at the hearing that the girls, then ages twelve and thirteen, had "more protective capacity" than O.J. *Id*. at 85. Likewise, those children were not involved in the incident on May 19, which was a primary catalyst for CYS filing a petition on O.J.'s behalf. Finally, there was evidence that the siblings had the opportunity to reside with their father on occasions while O.J. did not, reducing the court's concern for them as to Mother's housing instability. *Id*.

In sum, we have no cause to disturb the juvenile court's order finding O.J. dependent.

Order affirmed.
Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 04/29/2025